## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **NATIONWIDE MUTUAL FIRE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 15-351-CG-N** |
| | ) | |
| **D.R. HORTON, INC.—** | ) | |
| **BIRMINGHAM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Nationwide Mutual Fire Insurance Company's ("Nationwide") Motion for Summary Judgment (Doc. 60), brief in support (Doc. 61), Defendant D.R. Horton, Inc.—Birmingham's ("DRHI-B") response in opposition (Doc. 71), and Nationwide's reply (Doc. 73). The Court simultaneously considers Nationwide's motion to preclude evidence of counterclaim plaintiff's contract-related damages (Doc. 59), DRHI-B's response (Doc. 68), and the reply (Doc. 70); Nationwide's motion to strike affidavit (Doc. 69), DRHI-B's response (Doc. 72), and the reply (Doc. 75); and finally Nationwide's motion to strike affidavit filed in response to motion for summary judgment (Doc. 74), DRHI-B's response (Doc. 76), and the reply (Doc. 77). For the reasons set forth herein, Plaintiff's motion for summary judgment is due to be **GRANTED IN PART** and **DENIED IN PART**. Upon review of the record and the parties' arguments, the Court also

finds it proper to **DENY** both motions to strike the affidavit. As such,

Nationwide's motion to preclude evidence is found to be **MOOT**.

## I. BACKGROUND

This action seeks a declaratory judgment as to Nationwide's rights,

obligations, and duties, if any, to provide a defense and indemnity[1] coverage

to DRHI-B pursuant to a commercial general liability insurance policy issued

by Nationwide to Olmedo Construction Co., Inc. ("Olmedo") with respect to an

action pending in the Circuit Court of Baldwin County, Alabama. (Doc. 1, ¶

28).  In response to Nationwide's seeking declaratory judgment, DRHI-B has

counterclaimed for breach of contract and bad faith and has pled the

affirmative defense of estoppel. (Doc. 7, ¶¶ 2–3, 33, 42).

### A. The Relationship Between Olmedo and DRHI-B

On September 7, 2006, Olmedo entered into a contract with DRHI-B[2]

to become an independent contractor for framing, concrete, brick, and roofing

labor on a blanket basis. (Doc. 1, Ex. 5, p. 1, 6). In this contract, Olmedo

agreed to the following provisions:

---

[1] Because the underlying suit filed in Alabama state court is not yet finalized, this Court will only address Nationwide's duty to defend; the question of its obligation or duty to indemnify DRHI-B is **NOT RIPE**. See Assurance Co. of Am. v. Legendary Home Builders, Inc., 305 F.Supp.2d 1266, 1270 (S.D. Ala. 2003) ("First, with regard to the issue of ripeness, the other district courts in this Circuit have held that an insurer's duty to indemnify is not ripe for adjudication in a declaratory judgment action 'until the insured is in fact held liable in the underlying suit.'") (citations omitted).

[2] While the parties initially contested the identity of the party to the contract, DRHI-B indicates that "DRH, Inc." was a shorthand used to indicate "D. R. Horton, Inc.—Birmingham" in contracts at the time. (Doc. 60, Ex. 13).

**11.1 General Liability**. Contractor [Olmedo] agrees to carry a Broad Form Commercial General Liability Insurance on an Occurrence Form ("the CGL Policy"), with completed operations coverage which contains a per occurrence limit of no less than One Million Dollars ($1,000,000.00), and an aggregate limit of no less than Two Million Dollars ($2,000,000.00) protecting against bodily injury, broad form property damage, and personal injury claims arising from the exposures of: (i) premises-operations; (ii) products and completed operations including materials designed, furnished, and/or modified in any way by Contractor (with a separate aggregate limit at least equal to the general aggregate limit); (iii) independent subcontractors; (iv) contractual liability risk covering the indemnity obligations set forth in this Agreement; and (v) where applicable, property damage resulting from explosion, collapse, or underground (x, c, u) exposures. The CGL Policy shall not exclude from coverage the type of, or nature of, the Work or limit the type of structure on which the Work is to be performed. The CGL policy shall not contain a deductible or self insured retention of more that $25,000.00. Contractor shall continuously maintain a commercial general liability policy covering completed operations for any applicable statute of repose for commencing lawsuits associated with the Work. [. . .]

**11.3 General Requirements Applicable to All Required Insurance**. Contractor shall add Owner [DRHI-B] as an Additional Insured on the CGL Policy or policies required above covering both on-going and completed operations (equivalent to form CG20101185 or CG2037). [. . .]

**11.4 Proof on Insured Status**. Contractor shall provide evidence that all required insurance is in full force by furnishing Owner with a Certificate of Insurance, or certified copies of the required policies. Each Certificate of Insurance or policy shall contain an unqualified clause to the effect that the policy shall (i) not be subject to cancellation, non-renewal, adverse change, or reduction of amounts of coverage without thirty (30) days' prior written notice to owner, (ii) be carried continuously from the date of commencement of the Work until expiration of the period of the Contractor's warranty provided in this

> Agreement, (iii) specifically identify Owner as an
> Additional Insured, and (iv) indicate that coverage applies
> in the state where the Work is being performed. [. . .]

(Doc. 1, Ex. 5, p. 5). Olmedo then obtained a commercial general liability insurance policy from Plaintiff Nationwide through its captive agent Kilgro & Associates, Inc. ("Kilgro & Associates"). (See Doc. 73, p. 2–3; Doc. 71, Ex. 10). Beginning in 2009, Kilgro & Associates sent DRHI-B Certificates of Insurance and copies of the policy endorsements as proof of Olmedo's policy coverage and DRHI-B's status as an additional insured. (See Doc. 71, Exs. 7, 23–26, 28–29, 31).

**B. The Underlying Suit**

On May 16, 2013, Olmedo employee Roberto Campos Leco worked on a house being built on Lot 109, located at 9621 Cumbria Road, Daphne, Alabama, as a member of the framing crew. (Doc. 1, Ex. 3, p. 3). The truss system on the job site collapsed, causing Mr. Leco to fall to his death. Id. Mr. Leco's personal representative brought an action in Alabama state court against Olmedo and others for acts and/or omissions allegedly causing Leco's death.[3] (See Doc. 1, Ex. 2). In May 2014, the underlying plaintiff amended the complaint to add D.R. Horton, Inc. as a defendant. (Doc. 1, Ex. 3, p. 2). The complaint was further amended to correct the party name to DRHI-B. (Doc. 1, Ex. 4). In the Saddler complaint, the plaintiff alleges the following:

> 40.   [DRHI-B] was the owner of the Lot 109 house and
> served as the general contractor for the construction of

---

[3] Saddler et. al v. Mega Constr. Co., Inc., et. al, CV 3013-901074-REW (Cir. Ct. Baldwin Cnty.).

the Lot 109 house. In that dual capacity, [it] had the right and authority to direct its subcontractors on the means and methods of completing the framing work on the Lot 109 house. Because of its right of control over the means and methods of framing and construction, [DRHI-B] had a duty to provide its subcontractors with a reasonably safe place to work and with the tools and materials needed to perform the work safely. As the owner-general contractor [DRHI-B] also had a duty to coordinate among those responsible for the house design, the truss system design, the truss system fabrication and, most importantly, the framing crews, to make sure that the framers were familiar with those instructions and had a plan to follow the instructions by installing appropriate permanent and temporary bracing.

41.     [DRHI-B] negligently or wantonly failed to provide a safe place for Olmedo employees to work and negligently failed to coordinate among those responsible for the truss system design and installation because: (a) it did not require the presence of the truss system bracing plan on site or in the building plans; (b) it did not coordinate and communicate with the house and truss system designers to make sure that a bracing plan was provided to the subcontractors, (c) it did not require its subcontractors to be trained in how to properly brace and support truss systems; (d) it did not provide the equipment and means for subcontractors to properly protect their employees from falls; (e) it did not inspect and supervise the work to insure that the truss systems were properly braced; and (f) it did not warn it[s] subcontractors to stop work in windy conditions.

(Doc. 1, Ex. 4, p. 10–11). In addition, the complaint alleges DRHI-B "negligently or wantonly hired [Olmedo] to perform framing and supervisory services on the Lot 109 house." Id. at 12. As a basis for claiming Olmedo was "unqualified," the complaint states,

[Olmedo]: (a) did not employ trained employees and supervisors who could communicate in the English language; ([b]) did not employ employees who knew the safe way to brace truss systems; (c) did not provide

5

> adequate fall protection training and equipment for its framers; (d) had no formal fall protection program; (e) did not insure that proper truss system bracing instructions were provided by [DRHI-B] or the vendors supplying the truss systems; and (f) was not licensed as a general contractor, home builder or framer.

Id.

After being joined as a defendant, DRHI-B notified Nationwide of the underlying suit and requested defense under Olmedo's policy. (See Doc. 60, Ex. 1, p. 33–34) (Thomas deposition testimony stating that Nationwide received notice of the underlying suit in June 2014); (Doc. 71, Ex. 4) (e-mail from DRHI-B's counsel to Nationwide dated July 2, 2014).[4] Nationwide, however, argues DRHI-B delayed in giving notice of the suit until September 2014 and, thus, failed to comply with the notification requirement in Olmedo's policy. (Doc. 1, ¶ 25).

Between June 2015 and the filing of the instant action in July 2016, Nationwide never tendered a defense to DRHI-B. (See Doc. 61, Ex. 13; Doc. 7, ¶¶ 18–22).

## C. The Insurance Policy in Effect

Nationwide claims it issued policy ACP GLGO 2324496714 to Olmedo with effective dates of August 5, 2012 through August 5, 2013 (the "232

---

[4] DRHI-B also claims to have sent a letter via facsimile and U.S. mail to Nationwide through its captive agent Kilgro & Associates in June 2013. See Doc. 71, Ex. 32; Doc. 7, ¶ 12. Although this letter predates the addition of DRHI-B to the underlying suit, it nonetheless requests a defense and indemnity in anticipation of a suit. Nationwide claims Kilgro & Associates never received this communication and has no record of DRHI-B's request in June 2013. See Doc. 71, Ex. 33, p. 6, 10.

Policy"). (Doc. 1, Ex. 1 at 2). According to Nationwide, this policy listed DRHI-B as an additional insured only for completed operations, with the project site listed as "2900 US Hwy 98, Bld A, Ste 202, Daphne, AL 36526."[5] (Doc. 1, Ex. 1 at 37) (capitalization omitted). Because the occurrence in the underlying suit transpired during an ongoing project at a site that differs from that listed on the endorsement, Nationwide contends it owes neither defense nor indemnification to DRHI-B. (Doc. 62, p. 20–21). Nationwide also cites other policy exclusions, such as the "Employer's Liability" and "Worker's Compensation And Similar Laws" sections, as evidence it does not owe defense or indemnification to DRHI-B under the 232 Policy. (Doc. 1, ¶ 27).

DRHI-B, however, argues Nationwide erroneously deleted ongoing operations coverage, which was included Olmedo's original policy, during a 2009 rewrite.[6] DRHI-B contends that agent Kilgro requested to add completed operations coverage, which triggered a rewrite of the policy. When the new policy was issued, Nationwide mistakenly replaced the ongoing operations coverage with completed operations rather than merely adding the completed operations coverage. Nationwide, however, argues that the rewritten policy is in accord with agent Kilgro's request and maintains that only completed operations coverage is available in the 232 Policy. (See Doc. 71, Ex. 1, p. 425–27, 525).

---

[5] This address corresponds to DRHI-B's corporate address for its South Alabama operations. (Doc. 60, Ex. 1, p. 126).
[6] See, *infra*, Section II.D for a further explanation of the request for completed operations coverage and the rewrite of Olmedo's policy.

DRHI-B further posits Nationwide is estopped from relying solely on the 232 Policy as a basis for excluding coverage because Nationwide, through its captive agent, issued Certificates of Insurance and copies of the policy endorsements indicating DRHI-B's status as an additional insured for both completed and ongoing operations without geographical limitations. (Doc. 71, p. 1–2). Kilgro & Associates prepared and sent the Certificates of Insurance to DRHI-B through its insurance vendor Ebix. (Doc. 71, Ex. 18, p. 101–02). According to Nationwide, Kilgro & Associates could not have created the endorsements with a policy number; these endorsements necessarily would have come from Nationwide's underwriting department through its computer system. Id. Thus, Kilgro & Associates merely attached the endorsements available with the policy in Nationwide's system at the time to the Certificates of Insurance. (Doc. 71, Ex. 1, p. 396–404). DRHI-B further contends Nationwide is estopped from excluding coverage under the 232 Policy because it failed to deliver a copy of the policy pursuant to Ala. Code. § 27–14–19  (1975). (Doc. 7, ¶¶ 24, 41). The parties do not dispute that DRHI-B did not request a copy of the policy from Nationwide prior to the initiation of this suit. (Doc. 62, p. 11; Doc. 71, p. 5).

In December 2012 Kilgro & Associates responded to DRHI-B's request for proof of insurance and sent a Certificate of Insurance along with copies of the relevant endorsements. (Doc. 71, Ex. 31). The Certificate of Insurance states the policy number as ACP GLGO 2304496714 with effective dates of

August 5, 2012 through August 5, 2013.[7] <u>Id.</u> Additionally, the Certificate of Insurance describes the attached endorsements: "Below named certificate holder is also named as Additional Insured (Form ACP0013 attached) as respects to above. [. . .]" <u>Id.</u> The attached endorsements, which reflect the policy number stated on the Certificates, indicated coverage for both completed operations at "All Locations" and for on-going operations (Form ACP-0013). <u>Id.</u> The Certificate of Insurance contains a disclaimer, stating:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRSENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.
> ***
> IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. [. . .] A statement of this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

<u>Id.</u>[8] (capitalization in original).

## D. Nationwide's Investigation of DRHI-B's Coverage Claim

In September 2014 Nationwide began investigating whether DRHI-B was covered under Olmedo's policy and informed DRHI-B that it was not

---

[7] This Certificate of Insurance also lists the 2013 calendar year as the effective date for Workers' Compensation and Employer's Liability coverage.
[8] The Court uses the certificates found in DRHI-B's response, Doc. 71, Ex. 31 because that document states the coverage period relative to the date of loss. The other certificates produced in discovery contain the same, or substantially the same, disclaimer. <u>See</u> Doc. 60, Ex. 8.

covered under the 232 Policy. (Doc. 61, Ex. 12). Nationwide contends the policy number stated on the Certificates of Insurance DRHI-B submitted corresponds to Olmedo's policy from August 2010 through August 2011 and that "it appears the policy number and dates on the certificate of insurance do not match up."[9] Id.

Upon further investigation, Nationwide discovered that Olmedo's original policy from 2008 listed DRHI-B as an additional insured for ongoing operations. (Doc. 71, Ex. 15; Ex. 10). In 2009, agent Kilgro requested that DRHI-B be added to the policy as an additional insured for completed operations (form CG-7160). (Doc. 71, Ex. 15). Suzanne Shore, a senior commercial underwriter at Nationwide, indicated that Olmedo's policy would have to be re-written as "a PR policy" to include the completed operations endorsement. Id. She stated, "I have approval to add this endorsement once the policy is rewritten. [. . .]" Id. In her 2014 investigation of the 2009 policy rewrite, claims agent Cynthia Thomas found that the "[ongoing] ops [operations] endorsement for the PR policy, CG2010, was never added for either of the AIs [additional insureds] on this re-write." Id. She further inquired, "Did the agent's request to add DR Horton via CG 7160 / completed ops ask that DR Horton *only* be written as AI for completed ops, and not to write DR Horton as AI for ops anymore? Or did we drop the ball and just

---

[9] DRHI-B submitted a copy of its contract with Olmedo, a copy of the underlying complaint, a Certificate of Insurance for August 2013 through August 2014 listing policy number ACP GLGO 2304496714, and copies of the attached endorsements. (Doc. 71, Ex. 4).

missed that endorsement on the re-write?" Id. (emphasis in the original). In response, Jan Aguilar, a commercial underwriting specialist for Nationwide, stated, "I found two emails on file from 2009 under the existing PCIO policy regarding the re-write and that DR Horton had been added with the CG 7160 per the agents [sic] request. However, there is no mention of continuing them under the AC corresponding endorsement CG 2010." Id.; see also Doc. 71, Ex. 1, p. 424–32.

After its review of the 232 Policy, Nationwide determined it did not owe a defense. In her deposition Thomas explained,

> We never made a decision to not extend a defense. We just never got proof of the information that we needed in order to—well, we didn't decide not to extend a defense. We didn't believe we owed a defense, but we knew you guys [DRHI-B] felt differently. So we actually just decided to file the declaratory judgment action and let a judge decide.

(Doc. 71, Ex. 1, p. 40).

### E. DRHI-B's Claim for Damages

DRHI-B seeks compensatory damages for its attorneys' fees and related costs—including as yet undetermined indemnity costs—it incurred in defending the underlying suit.[10] (Doc. 7, p. 10, 12). As of March 2016, DRHI-B

---

[10] DRHI-B repeatedly reminds the Court and Nationwide that the underlying suit is not resolved. While it was scheduled for trial beginning August 15, 2016, the parties settled on August 13. That settlement has not yet been finalized. As such, DRHI-B does not—and cannot—yet know what its total damages are. (See Doc. 71, p. 5; Doc. 68, p. 6). On September 19, 2016, the parties entered a Joint Stipulation of Dismissal resolving all claims and stating that each party will bear its own costs. (Saddler et. al v. Mega Constr. Co., Inc., et. al, CV 3013-901074-REW, Doc. 1024 (Cir. Ct. Baldwin Cnty.

claims it has expended $380,294.89 in this pursuit.[11] (Doc. 61, Ex. 14). DRHI-B further acknowledges it reached a settlement agreement with a third party insurance company to cover one-third of the costs of defending the underlying suit, as well as the receipt of a lump sum settlement from an additional third party. (Doc. 71, p. 5; Doc. 60, Ex. 4, p. 56–57). DRHI-B admits these payments or credits do not appear on the invoices or billing statements it provided to Nationwide during discovery. Id. Nationwide contends the evidence of DRHI-B's expenditures is insufficient to determine the hourly rate(s), the nature of the tasks performed, the time billed, and other factors relevant to determining the reasonableness of the attorneys' fees. (See Doc. 62, p. 32–33; Doc. 59, p. 4, 8–11).

In its motion to preclude evidence of DRHI-B's breach of contract damages (Doc. 59), Nationwide contends DRHI-B failed to produce any evidence, except for the monthly billing statements, relating to its claimed damages. (Doc. 59, p. 8–9). It further argues DRHI-B's failure to submit attorney testimony, including expert testimony, as to the necessity and reasonableness of the hours spent and the hourly rate merits a finding of summary judgment. Id. at 9–11. Furthermore, Nationwide asks this Court to limit DRHI-B's evidence of its contract damages to the monthly billing

---

Sept. 19, 2016)).

[11] In an affidavit submitted along with its response to Nationwide's motion for summary judgment, DRHI-B updated its accounting of the expenses and fees it has occurred. It states it has spent a total of $420,041.34 on fees and expenses as of the end of June 2016. Doc. 71, Ex. 35, p. 3). This affidavit is the subject of Nationwide's motions to strike and will be discussed below.

statements produced during discovery. (Doc. 70, p. 4).

In response to the motion for summary judgment and the motion to preclude evidence (Docs. 71, Ex. 35; 68, Ex. 2), DRHI-B submitted the affidavit of J. Burris ("Buzzy") Riis, one of its attorneys for the underlying suit. This affidavit is the subject of Nationwide's two motions to strike (Docs. 69, 74). In this affidavit, Riis provides testimony and opinions regarding DRHI-B's legal bills in the underlying suit, including the hours expended, the hourly rates of the different attorneys and paralegals, and the fact that the bills reflect only the fees and expenses charged for the underlying action (and not inclusive, for example, of secondary but related litigation, including the instant matter). (See Doc. 68, Ex. 2). DRHI-B admits that it failed to include Riis in its initial and ongoing discovery disclosure as a witness but maintains that its discovery disclosures (the monthly billing statements and evidence of payment) are sufficient evidence to withstand summary judgment; it also argues that its failure to disclose Riis is harmless under Fed. R. Civ. P. 37(c) and, therefore, that his affidavit should not be stricken. See Docs. 68, p. 7–16; 72, p. 2, 5–13).

Moreover, DRHI-B rejects Nationwide's claims that it had no prior knowledge of Riis, that it could not have anticipated this type of evidence, or that it did not have an opportunity during discovery to develop a record against the claim for attorneys' fees. (See Docs. 69, p. 2–4; 72, p. 2–7). DRHI-B asserts that it disclosed, during the discovery window, the monthly invoices from its counsel (Doc. 59, Ex. 2), evidence of payment (id.), and responses to

interrogatories regarding calculation of its damages and its representation in the underlying suit (Doc. 59, Ex. 4, p. 12–13). Notably, in its response to Nationwide's interrogatories, DRHI-B specifically answered, "[A]t all times [DRHI-B] has been represented by Bradley Smith, Buzzy Riis[,] and the law firm of Hand Arendall in the underlying action. [DRHI-B] is responsible for the payment of all fees and expenses with one-third of those fees and expenses being reimbursed by Essex as the insurer for Mega Construction, subject to a negotiated agreement." (Doc. 59, Ex. 4, p. 12–13). Notably, these responses were submitted to Nationwide on February 18, 2016. (Id. at 16). As the record indicates, discovery initially closed on April 29, 2016 but was extended through July 1, 2016. (See Docs. 20 & 51).

## II. ANALYSIS

Nationwide moves this Court for summary judgment as to both its declaratory judgment complaint and DRHI-B's counterclaims for breach of contract and bad faith. Before addressing summary judgment, this Court will turn its attention to Nationwide's motions to strike and its motion to preclude evidence.

### A. Motions to Strike and Motion to Preclude Evidence

Nationwide's motions to strike (Docs. 69, 74) challenge the propriety of Riis's affidavit and request that it be stricken because DRHI-B never identified Riis as a witness in its initial disclosures or any amendments thereto; Nationwide further claims it is "obvious[ly]" harmed by the belated

14

admission of Riis's affidavit because DRHI-B denied Nationwide the ability to collect evidence regarding the fees and expenses during the discovery window prior to the submission of its motion for summary judgment. (See Doc. 69, p. 6; Doc. 75, p. 6). Its motion to preclude evidence (Doc. 59) asks this Court to limit the evidence regarding DRHI-B's contract-related damages to the monthly billing statements and evidence of payment submitted during discovery.

## 1. Legal Standard

Under Rule 26(a)(1)(A), Fed. R. Civ. P., a litigant in federal court must provide initial disclosures including "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information." Id. The Rule 16(b) Scheduling Order (Doc. 20) obligated the parties to exchange initial disclosures on or before April 29, 2016, and the Amended Scheduling Order (Doc. 51) reopened discovery until July 1, 2016. By rule, the disclosure obligation is continuing, such that a party must supplement its disclosures "at appropriate intervals . . . if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 26(e)(1), Fed.R.Civ.P. Magistrate Judge Nelson ordered the

parties to make Rule 26(e) supplementation "'at appropriate intervals' and 'seasonally.'" (Doc. 20, ¶ 8.)

If a party without substantial justification fails to disclose required information, then that party "is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Rule 37(c)(1); see also Cooper v. Southern Co., 390 F.3d 695, 728 (11th Cir. 2004) ("it was within the sound discretion of the trial judge to sanction plaintiffs for their failure to disclose by enforcing the unambiguous terms of Rule 37(c)"). In evaluating whether the failure to disclose a witness is harmless, the Eleventh Circuit considers "(1) the importance of the testimony; (2) the reason for the appellant's failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness had been allowed to testify." Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc., 389 F.3d 1339, 1353 (11th Cir. 2004). The non-producing party has the burden of showing that its actions were substantially justified or harmless.  Stallworth v. E-Z Serve Convenience Stores, 199 F.R.D. 366, 368 (M.D. Ala. 2001) (citing Burney v. Rheem Mfg. Co., 196 F.R.D. 659, 691 (M.D. Ala. 2000)).

This Court's jurisdiction is based on diversity, and Alabama is the forum state; therefore, the court applies the law of the State of Alabama to resolve disputes as to the reasonableness of attorneys' fees. Kearney v. Auto-Owners Ins. Co., 713 F.Supp.2d 1369, 1373 (M.D. Fla. 2010) (citing Trans Coastal Roofing Co., Inc. v. David Boland, Inc., 309 F.3d 758, 760 (11th Cir.

2002) ("Since Boland's claim for attorney's fees sounds in state law and reaches up by way of federal diversity jurisdiction, we apply the substantive law of Florida, the forum state.") (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).

It is well-settled that Alabama law permits the recovery of attorneys' fees "incurred as a proximate result of . . . [a] refusal to defend" as an element of damages in a breach of contract suit. Green v. Standard Fire Ins. Co. of Ala., 477 So. 2d 333, 335 (Ala. 1985). "[The claimant] is entitled to recover attorneys' fees only 'to the extent that they are necessarily incurred and reasonable in amount.'" Id. (quoting Highlands Underwriters Ins. Co. v. Elegante Inns, Inc., 361 So. 2d 1060, 1066 (Ala. 1978)). "The determination of whether an attorney fee is reasonable is within the sound discretion of the trial court." Kiker v. Probate Court of Mobile County, 67 So. 3d 865, 867 (Ala. 2010) (citations omitted).  In contemplating the reasonableness of the fees requested,

> Alabama courts consider non-exclusive list of criteria, including: "(1) [T]he nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances."

(<u>Stewart v. Continental Cas. Co.</u>, 2015 WL 225290, *2 (S.D. Ala. Jan. 16, 2015) (quoting <u>Pharmacia Corp. v. McGowan</u>, 915 So. 2d 549, 552–53 (Ala.2004)). While "[t]he fee charged by counsel . . . is not conclusive on the count of reasonableness of the fee to be awarded as damages," <u>Highlands Underwriters Ins. Co.</u>, 361 So. 2d at 1066, the trial court "may calculate the award based on its own experience, knowledge, and observations" when " the rates of hours claimed seem excessive or lack the appropriate documentation." <u>Rhodes v. Davis</u>, 2010 WL 4260048, *5 (S.D. Ala. Oct. 25, 2010) (citing <u>Norman v. House Auth. of the City of Montgomery</u>, 836 F.2d 1292, 1303 (11th Cir. 1988). Generally, attorney affidavits detailing the hourly rates and the reasonableness of the time expended are accepted. <u>See id.</u>[12] The Alabama Supreme Court has also accepted a client's trial testimony of the amounts paid to her attorney and the checks proving those payments as sufficient evidence of compensatory damages for legal expenses in a duty to defend and bad faith claims. <u>See Acceptance Ins. Co. v. Brown</u>, 832 So. 2d 1, 20–21 (Ala. 2001).

**2. Discussion**

As this Court has noted, "Discovery in federal court is not a game of hide the ball[.]" <u>Hosea v. Langley</u>, 2006 WL 314454, *5 (S.D. Ala. Feb. 8,

---

[12] In <u>Rhodes</u>, the party seeking fees also submitted a "detailed time sheet" to back up the attorneys' affidavits. While no time sheets have been submitted in the instant case, the Court, as discussed below, finds this issue to be **MOOT** because of the impossibility of determining, with any specificity, the damages until the underlying case is fully resolved.

2006). While the Court denounces DRHI-B's lackadaisical approach to submitting evidence regarding its damages, it cannot ignore Nationwide's complacency. As to Riis, "[counterclaim] defense counsel failed to take steps reasonably available to them to secure depositions or statements in a timely manner. Rather than being proactive in attempting to obtain the requisite discovery, [counterclaim] defense counsel was content to express indignation at [counterclaim] plaintiff['s] course of conduct, then sit back and do nothing until [the] declaration[ was] filed." Id. As the record demonstrates, Nationwide had ample notice of Riis's involvement in the underlying suit. His name was submitted in response to its interrogatory asking for information regarding DRHI-B's representation in the underlying suit and also appears on numerous documents related to the underlying suit. (See Doc. 59, Ex. 4, p. 12; Doc. 60, Ex. 7, p. 11). Further, it is unclear that Nationwide asked to depose defense counsel W. Bradley Smith specifically for the purpose of seeking information relating to DRHI-B's damages.[13] While Nationwide clearly asked for dates in order to depose Smith (see Doc. 59, Ex. 5), DRHI-B's response does not indicate that it would use no one from Hand Arendall as a witness (see id.). It simply stated it would not call Smith as a witness, which it has not done. Id. The entire line of correspondence regarding Smith's availability, in fact, fails to mention the purpose for deposing him or any request for discoverable information regarding DRHI-B's calculation of

---

[13] In fact, the parties' recounting of the oral conversations regarding Nationwide's request for Smith's deposition are completely divergent. Compare Doc. 59, p. 6 with Doc. 68, p. 5–6.

damages. Id.[14]

Moreover, the appearance of Riis's name in the interrogatory responses submitted well before the close of discovery indicates that Nationwide had the opportunity to ask to depose him and chose not to do so.[15] Nationwide did not file a motion to compel a witness regarding DRHI-B's damages or take further action to obtain discoverable evidence regarding them. The record further evidences that DRHI-B answered the discovery requests timely, included the information available to it regarding the legal fees and expenses it had paid, and disclosed settlement agreements with other parties to the underlying suit. As such, the Court finds that DRHI-B's omission of Riis from the witness list was harmless "because (a) [DRHI-B] did reveal [Riis's] identity [months] before the close of discovery, and (b) [Nationwide] failed to avail [itself] of procedural and investigative tools reasonably available to them to arrange [Riis's] deposition prior to the close of discovery despite

---

[14] The Court further considered Nationwide's notice of deposition of DRHI-B's corporate representative, which included a request for the person "most knowledgeable about the damages claimed." (Doc. 59, Ex. 3, p. 2). While DRHI-B's corporate representative could or did not answer specific questions about its attorneys' billing rates, hours worked, or the exact nature of the work done, he did answer Nationwide's questions about the third party contributions and other questions related to damages. Moreover, he testified that the monthly billing statements were the only damages DRHI-B had incurred as of that date. Id. at Ex. 1, p. 63. It is clear to the Court that the total amount of damages is unknown as the underlying matter has yet to be resolved.

[15] The Court notes the interrogatory responses were submitted on February 18, 2016. (Doc. 59, Ex. 4, p. 16). Nationwide requested dates to depose Smith on March 9, 2016, approximately three weeks after it had acquired Riis's name. (Id. at Ex. 5, p. 1). The record does not show any time where Nationwide requested to depose Riis or was otherwise denied access to him.

ample time for them to do so." <u>Hosea</u>, 2006 WL 414454 at *5; <u>see also</u>

<u>Northstar Marine, Inc. v. Huffman</u>, 2014 WL 6454940, *1–2 (S.D. Ala. Nov.

13, 2014) (denying a motion to strike evidence produced after the close of

discovery because the evidence was produced "a month before trial (such that

defendant has had sufficient time to tailor its trial strategy and trial

presentation to account" for it). The Court further finds Riis's affidavit

testimony is harmless, despite his nonappearance on any witness list,

because Nationwide "should not [be] surprised by this witness" because

attorneys' fees stemming from the underlying suit have been a part of DRHI-

B's damages claim since the beginning of this proceeding, and Riis's role as

counsel for the underlying suit for three or so years certainly qualifies him "to

testify as to the amount and value of his, his firm's, legal services." <u>See</u>

<u>McSweeney v. Kahn</u>, 347 Fed.App'x. 437, 442 (11th Cir. 2009) (Ga.)

(unpublished). For these reasons, the Court **DENIES** both motions to strike

((Docs. 69, 74) Riis's affidavit.

Because this Court denies the motions to strike Riis's affidavit, it finds

Nationwide's motion to preclude evidence of counterclaim plaintiff's contract-

related damages (Doc. 59) **MOOT**. Riis's affidavit, while untimely, presents

no harm to Nationwide's motion for summary judgment. Additionally, a final

calculation for DRHI-B's damages will be impossible to determine until the

underlying matter is completely resolved. As such, the evidence supporting or

refuting those claims will be revisited at the appropriate juncture.

**B. The Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's mission is to "determine whether there is a genuine issue for trial" and not to "weigh the evidence." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The burden is on the moving party to show that there is no genuine dispute as to any material fact. Id. at 256. In conducting its summary judgment analysis, the Court must construe all evidence "in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

After the movant meets its burden, the burden shifts to the nonmoving party "to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the nonmoving party fails to do so, the "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. Further, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotation marks omitted). There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986).

**C. Nationwide's Claim for Declaratory Judgment**

Under Alabama law, the insured bears the burden of establishing coverage by demonstrating that a claim falls within the policy, see Colonial Life & Accident Ins. Co. v. Collins, 194 So.2d 532, 535 (Ala. 1967), while the insurer bears the burden of proving the applicability of any policy exclusion. See U.S. Fidelity & Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala.1985). If an insurance policy is ambiguous in its terms, the policy must be construed liberally in favor of the insured, and exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage to the insured. Altiere v. Blue Cross & Blue Shield, 551 So.2d 290, 292 (Ala. 1989).

The Court notes that an "insurer's duty to defend is more extensive than its duty to [indemnify]." Porterfield v. Audubon Indem. Co., 856 So.2d 789, 791 (Ala. 2002) (quoting United States Fid. & Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala. 1985)).  Generally, an insurer's obligations with respect to providing a defense to its insured in an action brought by a third party are determined by the allegations contained in the third party's complaint. Ladner and Company, Inc. v. Southern Guaranty Ins. Co., 347 So.2d 100, 102 (Ala. 1977) (citations omitted).  "If the allegations of the injured party's complaint show an accident or occurrence which comes within the coverage of the policy, the insurer is obligated to defend regardless of the ultimate liability of the insured." Id. (citing Goldberg v. Lumber Mutual

Casualty Ins. Co., 297 N.Y. 148, 77 N.E.2d 131 (1948)).  Thus, if there is any

potential for coverage arising out of the allegations, then Nationwide would

have at least a duty to defend.

> However, a court is not constrained to consider only the
> allegations of the underlying complaint, but may
> additionally look to facts which may be proved
> by admissible evidence. Tanner [v. State Farm Fire & Cas.
> Co., 874 So.2d 1058, 1064 (Ala.2003)]; see also Hartford
> Cas. Ins. Co. v. Merchants & Farmers Bank, 928 So.2d
> 1006, 1010 (Ala.2005) (in deciding whether the allegations
> of the complaint show a covered accident or occurrence,
> "the court is not limited to the bare allegations of the
> complaint ... but may look to facts which may be proved
> by admissible evidence") (citations omitted). The test,
> ultimately, is this: "The insurer owes no duty to defend
> only if neither does the complaint against the insured
> allege a covered accident or occurrence nor does the
> evidence in the litigation between insurer and insured
> prove a covered accident or occurrence." Tanner, 874
> So.2d at 1065.

Essex Ins. Co. v. Foley, 2011 WL 1706214, *3 (S.D. Ala. May 5, 2011).  If both

covered claims and non-covered claims are pleaded, then the insurer's duty to

defend extends at least to those covered claims. Tanner, 875 So.2d at 1065.

In the instant action, Nationwide contends it owes no coverage to

DRHI-B under the 232 Policy because (1) the underlying suit alleges only

DRHI-B's negligence and (2) the 232 Policy only offers completed operations

endorsement with a project site that differs from the accident site. DRHI-B,

however, counters that Nationwide (1) erroneously deleted DRHI-B's ongoing

operations coverage as an additional insured in the 2009 re-write and (2) is

estopped from denying coverage (a) based on the representations it made on

the Certificate of Insurance and the attached endorsements it received from

2010 through 2013 and (b) because it failed to deliver a copy of the policy pursuant to Alabama law.

After reviewing the evidence and considering the facts in the light most favorable to DRHI-B, this Court finds that Nationwide is precluded from denying coverage under the 232 Policy based on the questions of material fact as to the exclusion of DRHI-B's ongoing operations endorsement in the 2009 rewrite and because of misrepresentations made in the Certificate of Insurance and the attached endorsements. As such, summary judgment as to its declaratory judgment claim is due to be denied.

**1. The 2009 Rewrite Request**

Nationwide asserts that the 232 Policy provides only a completed operations endorsement for DRHI-B with a project site listed as its South Alabama headquarters on Highway 98. Yet Nationwide's only documented authority for deleting DRHI-B's ongoing operations endorsement from Olmedo's policy is two e-mails from the underwriting department, one of which purports "to **add** this [completed operations] endorsement once the policy is rewritten[.]" (Doc. 71, Ex. 15) (emphasis added).

To justify this interpretation, Aguilar stated, "there is no mention of continuing [the ongoing operations endorsement] under the AC corresponding endorsement CG 2010." Id. The Court finds a question of material fact as to whether the underwriter was authorized merely to add the completed operations endorsement to the rewritten policy or to replace ongoing operations coverage with the completed operations endorsement.

Nationwide's insistence that the rewritten policy accurately reflected the agent's request cannot stand on its own: Aguilar testified in deposition that she did not specifically determine whether the agent's request was to replace ongoing coverage with completed coverage or simply to add completed coverage. (Doc. 71, Ex. 1, p. 425–27). A fact finder could determine Nationwide erroneously rewrote the 2009 policy to exclude ongoing coverage—whether, to adopt Thomas's language, Nationwide "dropp[ed] the ball and just missed [the ongoing operations] endorsement on the re-write." (Doc. 71, Ex. 15). Looking at the record as a whole, it is unclear whether the 232 Policy's exclusion of the ongoing operations endorsement was properly executed or documented in Nationwide's own system. The ample evidence provided by the Certificates of Insurance with ongoing operations endorsements for the years surrounding—and including—the May 2013 occurrence creates a question of fact for the fact finder to resolve. See Ex parte Clarke, 728 So. 2d 135, 141 (Ala. 1998) (finding "a factual dispute as to whether the endorsement was part of the Clarkes' insurance policy" and determining, "Allstate was not entitled to a summary judgment based on its assertion that the Clarkes' had failed to comply with the 'examination under oath' provision and with the provision requiring the insureds' cooperation.").

## 2. DRHI-B's Estoppel Argument

DRHI-B argues Nationwide is estopped from denying coverage based upon the misrepresentations made by Kilgro & Associates on the Certificates of Insurance and the attached endorsements DRHI-B received beginning in

2010 through 2013. (See Doc. 71, Exs. 4, 23, 25, 26, 31). It further claims
Nationwide is precluded from denying coverage based on its failure to deliver
a copy of the policy pursuant to Ala. Code § 27–14–19 (1975). Because this
Court finds the first argument persuasive, it will not reach the second
argument.

Both parties rely heavily on Ala. Elec. Coop., Inc. v. Bailey Constr. Co.,
Inc., 950 So. 2d 280 (2006), for the proposition that Nationwide either is or is
not estopped from denying coverage. In that case, the Alabama Supreme
Court determined that an additional insured cannot rely on certificates of
insurance alone as proof of coverage and further determined that the
insurance policy is the controlling document. Id. at 285. Specifically, the
Alabama Supreme Court found:

> Where an entity requires another to procure insurance
> naming it an additional insured, that party should not
> rely on a mere certificate of insurance, but should insist
> on a copy of the policy. A certificate of insurance is not
> part of the policy—if it states that there is coverage but
> the policy does not, the policy controls.

Id. (internal citations omitted). In the instant case, however, DRHI-B did not
rely solely on certificates of insurance. Rather, it requested and received
copies of the endorsements, which are a part of the policy, that provided it
with coverage for ongoing operations. The Alabama Supreme Court
addressed this scenario in its next sentence: "A developer or general
contractor generally should demand more proof [than just a certificate of
insurance], including a specific additional insured endorsement, to confirm

their additional insured status." Id. While a certificate of insurance, complete with its disclaimer, cannot override a policy that contradicts it, an endorsement alters the policy in question. Id. at 285–86. The Alabama Supreme Court thus indicated that an additional insured's possession of a certificate plus the actual, specific endorsements would be indicative of its reasonable belief that the documents granted coverage. Id.

This difference between DRHI-B's actions and those of Alabama Electric Cooperative, Inc.'s ("AEC") actions significantly impacts the analysis under Ala. Elec. Coop., Inc., 950 So. 2d.[16] In that case, the Alabama Supreme Court found that AEC did not

> actually attempt[] to obtain a copy of the policies or the additional-insured endorsements that would have existed had AEC been named as an additional insured on the policies. [. . .] Based on the facts of this case, we hold that AEC and its insurers have not presented substantial evidence indicating that it was reasonable for AEC to rely on the certificates of insurance indicating that it was an additional insured in awarding [defendant] the [construction] contract.

Id. at 286. Conversely, DRHI-B's request for and possession of the certificates plus the endorsements issued by Nationwide's captive agent indicates it reasonably relied on those documents—and not merely the certificates—as proof of its status as an additional insured for ongoing operations.

---

[16] Also of note is the contractual relationship between AEC's subcontractor as compared to DRHI-B's relationship with Olmedo. AEC's contract with its subcontractor did not expressly require that the subcontractor name AEC as an additional insured. DRHI-B's contract with Olmedo, however, expressly required additional insured coverage for both ongoing and completed operations as well as delivery of certificates of insurance. See Doc. 71, Ex. 8.

Furthermore, the West Virginia Supreme Court case cited in <u>Ala. Elec.</u>

<u>Coop., Inc.</u> favors an estoppel argument to prevent an insurance company's

denying coverage when a certificate of insurance misrepresents coverage:

> In the instant case we focus our analysis on the
> first exception, whether the insurer or its agent made a
> misrepresentation by issuing a certificate of insurance at
> the inception of coverage which resulted in the Board not
> having the coverage it desired. Our research indicates
> that "[i]t is well settled that an insurer may be equitably
> estopped from denying coverage where the party for
> whose benefit the insurance was procured reasonably
> relied upon the provisions of an insurance certificate to
> that party's detriment." <u>Lenox v. Excelsior Ins. Co.</u>, 255
> A.D.2d 644, 645, 679 N.Y.S.2d 749, 750 (1998) (citations
> omitted). <u>See also</u>, <u>Zurich Ins. Co. v. White</u>, 221 A.D.2d
> 700, 633 N.Y.S.2d 415 (1995) (insurer was estopped from
> asserting deductibles to liability coverage when certificate
> of insurance represented there were no deductibles);
> <u>Criterion Leasing Group v. Gulf Coast Plastering &</u>
> <u>Drywall</u>, 582 So.2d 799 (Fla.App.1991) (under doctrine of
> promissory estoppel, insurer was prevented from denying
> workers' compensation coverage to subcontractor's
> employee when subcontractor was named as a "coinsured"
> on certificate of insurance); <u>Bucon, Inc. v. Pennsylvania</u>
> <u>Mfg. Assoc. Ins. Co.</u>, 151 A.D.2d 207, 547 N.Y.S.2d 925
> (1989) (insurer estopped from denying the existence of
> plaintiff's coverage after issuing certificate of insurance
> identifying the plaintiff as an "additional insured"). "A
> Certificate of Insurance is an insurance company's
> written statement to its customer that he has insurance
> coverage, and the insurance company is estopped from
> denying coverage that the Certificate of Insurance states
> is in effect." <u>Blackburn, Nickels & Smith, Inc. v. National</u>
> <u>Farmers Union Property and Cas. Co.</u>, 482 N.W.2d 600,
> 603 (N.D.1992).
>
> We therefore hold that a certificate of insurance is
> evidence of insurance coverage, and is not a separate and
> distinct contract for insurance. However, because a
> certificate of insurance is an insurance company's written
> representation that a policyholder has certain insurance
> coverage in effect at the time the certificate is issued, the

> insurance company may be estopped from later denying
> the existence of that coverage when the policyholder or
> the recipient of a certificate has reasonably relied to their
> detriment upon a misrepresentation in the certificate.

Marlin v. Wetzel Cty. Bd. of Educ., 569 S.E.2d 462, 472–73 (2002). In the

instant case, both the certificates and the endorsements issued by Kilgro &

Associates represented that DRHI-B was an additional insured with ongoing

operations coverage. While the certificate clearly states it "does not constitute

a contract" between Nationwide and DRHI-B, it also clearly indicates that

the certificate holder is an additional insured when the policy is endorsed.

(See Doc. 71, Ex. 31) (certificate of insurance stating that "[i]f the certificate

holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed."). As

such, a fact finder may find it reasonable for DRHI-B to have relied on the

certificate and the accompanying endorsements as proof of coverage as an

additional insured for ongoing operations.

Moreover, Nationwide's assertion that its issued Certificates of

Insurance do not accurately reflect the policy information does not overcome

DRHI-B's estoppel argument. (See Doc. 61, Ex. 12) (Thomas's e-mail to

DRHI-B's counsel stating "it appears the policy number and dates on the

certificate of insurance do not match up"); see also Doc. 1, Ex. 1 (the 232

Policy) & Doc. 62, p. 7–9 (Nationwide's brief in support of summary judgment

claiming that DRHI-B's certificates and endorsements reflect the incorrect

policy number). As previously discussed, DRHI-B did not rely solely on the

Certificates of Insurance; it also secured copies of the specific additional

insured endorsement as evidence of its coverage. In <u>American and Foreign Ins. Co., Inc. v. Tee Jays Mfg. Co., Inc.</u>, 699 So. 2d 1226 (Ala. 1997), the Alabama Supreme Court found that an insurer's error of including coverage for which a premium has not been paid must be construed against the insurer. <u>Am. and Foreign Ins. Co., Inc. v. Tee Jays Mfg. Co., Inc.</u>, 699 So. 2d 1226, 1228 (Ala. 1997) ("Here, the policy, on its face, clearly provides business loss coverage for Tee Jays, and any mistake in including this coverage in the policy must be construed against A & F."). Additionally, Alabama courts have held that clerical errors do not invalidate an endorsement or nullify an insurer's obligation to honor the endorsement. <u>See id.</u>; <u>see also</u> <u>Waikar v. Royal Ins. Co. of Am., Inc.</u>, 765 So. 2d 11, 15 (Ala. Civ. App. 1999) (holding that a clerical error in an endorsement does not automatically invalidate the endorsement). As such, Nationwide cannot hide behind its own error to deny coverage.

This Court finds that the inconsistencies between the 232 Policy and DRHI-B's Certificate of Insurance and the endorsements attached thereto constitute an ambiguity as to the terms of the coverage provided. As such, the written instruments must be construed against Nationwide, the drafting party. <u>Tee Jays Mfg. Co., Inc.</u>, 699 So. 2d at 1228. In construing the facts in the light most favorable to DRHI-B, the Court finds a material issue of genuine fact as to the coverage afforded to DRHI-B; it also finds Nationwide is estopped from denying coverage based on the misrepresentations in the Certificates of Insurance and the endorsements

attached thereto. Summary judgment is, therefore, inappropriate.

**D. DRHI-B's Counterclaim for Breach of Contract**

The elements for a breach of contract claim are: "(1) the existence of a valid contract binding the parties in the action, (2) [plaintiff's] own performance under that contract, (3) the defendant's nonperformance, and (4) damages." <u>Southern Med. Health Sys., Inc. v. Vaughn</u>, 669 So.2d 98, 99 (Ala. 1995) (citations omitted). Because there is a material question of fact as to whether Nationwide erroneously omitted DRHI-B's ongoing operations endorsement in the 2009 re-write, <u>see, *supra* Part II.B.1</u>, the Court necessarily finds a material question of fact as to the existence of a valid contract binding the parties and as to Nationwide's nonperformance. For this reason, summary judgment must be denied as to DRHI-B's breach of contract claim.

**E. DRHI-B's Counterclaim for Bad Faith**

The tort of bad faith refusal to pay a claim requires evidence to support the following elements:

> (a) a breach of insurance contract, (b) the refusal to pay claim, (c) the absence of arguable reason, (d) the insurer's knowledge of such absence—with a conditional fifth element: "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."

<u>EMCASCO Ins. Co. v. Knight</u>, 2014 WL 5020044, *15 (N.D. Ala. Oct. 7, 2014) (quoting <u>National Sec. Fire & Cas. Co. v. Bowen</u>, 417 So.2d 179, 183 (Ala.

1982)).  "The plaintiff asserting a bad-faith claim bears a heavy burden." Shelter Mut. Ins. Co. v. Barton, 822 So.2d 1149, 1154 (Ala. 2001) (citing LeFevre v. Westberry, 590 So.2d 154, 159 (Ala. 1991)).  "[A] finding of bad faith based upon rejection of an insurer's legal argument should be reserved for extreme cases." Id. (quoting Safeco Ins. Co. of America v. Sims, 435 So.2d 1219, 1226 (Ala. 1983) (Jones, J., concurring specially)).  "The right of an insurer to deny a claim on any arguable legal issue is to be as zealously guarded as is its right to decline benefits on any debatable issue of fact, the test of reasonableness being the same." Id. (quoting Safeco, supra).

"To defeat a bad faith claim, the defendant does not have to show that its reason for denial was correct, only that it was arguable." Liberty Nat. Life Ins. Co. v. Allen, 699 So.2d 138, 143 (Ala. 1997).  "No matter how badly the insurer acted in investigating and evaluating the claim, if there was a debatable reason for refusing to pay the claim, when payment was refused, the insured was not entitled to prompt payment." State Farm Fire & Cas. Co. v. Balmer, 672 F.Supp. 1395, 1406 (M.D. Ala. 1987) (italics and citation omitted).  "[P]roof of mere negligence or mistake is not sufficient to support a claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure." Peachtree Cas. Ins. Co., Inc. v. Sharpton, 2001 WL 286919, *5 (M.D. Ala. March 20, 2001) (citation omitted).

"Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the [insurance] claim and, thus, the legitimacy of the denial thereof, the [bad faith] tort claim must fail and should not be

33

submitted to the jury." <u>Nat. Sav. Life Ins. Co. v. Dutton</u>, 419 So.2d 1357, 1362 (Ala.1982).  To make out a <u>prima</u> <u>facie</u> case of bad faith refusal to pay, the insured must generally show that he is entitled to a directed verdict on the contract claim. <u>Id.</u>

DRHI-B argues that Nationwide failed to investigate agent Kilgro's dissemination of certificates of insurance with accompanying endorsements (complete with policy numbers) that contradict Nationwide's records and staunchly relied only on the information available in its own system. (Doc. 71, p. 26–28). To support these contentions, it points to Thomas's testimony that she limited her investigation to Olmedo's policies issued for 2010–11, 2011–12, and 2012–13 and ignored DRHI-B's assertions that it should have had ongoing operations coverage on the date of loss. <u>See</u> Doc. 71, Ex. 18, p. 313–17. In her investigation, Thomas asked Aguilar "why [DRHI-B] would NOT have been an additional insured for [ongoing] operations?" (Doc. 71, Ex. 12) (emphasis in original). In response, Aguilar stated, "No other request for [DRHI-B] was made as I believe they assumed the CG 2010 [ongoing operations endorsement] was added back when it was re-written to the PR under the legacy platform." <u>Id</u>. During the course of her investigation, Thomas had reason to question why the 2009 re-written policy did not include ongoing operations coverage for DRHI-B, and the evidence indicates that she made surface-level inquiries but did not examine the endorsements Kilgro & Associates issued or other evidence relating to DRHI-B's claim that it was still covered by an ongoing operations endorsement.

As previously explained, even if the investigation was lacking, if there is a debatable reason for refusing to pay the claim, the insured cannot be held liable for bad faith. <u>Balmer</u>, 672 F.Supp. at 1406. "[P]roof of mere negligence or mistake is not sufficient to support a claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure." <u>Sharpton</u>, 2001 WL 286919 at *5 (citation omitted).  Where there was an arguable reason to deny the claim, "[t]he insurer's 'subpar' investigation cannot in and of itself sustain a tort action for bad faith." <u>Balmer</u>, 672 F.Supp. at 1405. Nationwide argues that DRHI-B's disagreement with the results of its investigation is not enough to carry a bad faith claim. <u>See</u> Doc. 71, p. 13. This Court finds, however, that a reasonable fact finder could interpret Nationwide's refusal to acknowledge the certificates of insurance and the attached endorsements that contradicted its internal information as more than "mere negligence or mistake" but as an attempt to avoid coverage. <u>See</u> Doc. 71, Ex. 33, p. 36 (Nationwide log notes stating, "I also noted that [Alabama] has NO anti-indemnity statutes, so depending on if we have a properly executed contract, and what it states in terms of indemnity, may have a huge bearing on exposure/liability on this claim."); <u>id.</u> at p. 43 ("Basic litigation strategy: Confirm no cov[erage] and address accordingly.").

In light of the above, the Court finds a reasonable fact finder could determine Nationwide acted in bad faith in denying DRHI-B a defense in the underlying suit. Accordingly, summary judgment is precluded.

**F. Damages from DRHI-B's Counterclaims**

35

The parties appear to agree that the basic language of the general commercial liability insurance policy controls Nationwide's duty to defend. While the parties disagree on the inclusion or exclusion of certain endorsements, they do not suggest that the basic terms and definitions provided in the 232 Policy would change. As such, this Court looks to the general provisions and definitions to determine when Nationwide's duty to defend, if found to apply in this case, began.

The 232 Policy states, "We [Nationwide] will pay those sums that the insured [or additional insured] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." (Doc. 1, Ex. 1, p. 12). The policy defines "suit" as, "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." (Id. at p. 26). Under this definition, Nationwide's duty to defend would not be triggered until a civil proceeding (or similar) is initiated. In the instant case, DRHI-B has submitted evidence for damages incurred beginning in May 2013, but the underlying suit against it was not opened until May 2014. (See Doc. 71, Ex. 4). DRHI-B was not owed any defense until it became a named party to the underlying suit.  As such, this Court finds that its claimed damages from May 2013 through April 30, 2014 are improper, and summary judgment is to be **GRANTED** as to these attorneys' fees and expenses. The Court will therefore reduce DRHI-B's amount of

36

claimed damages, as to date, from $420,041.34 to $366,794.44 ($420,041.34 − 50,568.35 = $366,794.44).[17] The Court declines to grant summary judgment as to the attorneys' fees and expenses incurred beginning in May 2014 to the present date for the underlying suit.

### III. CONCLUSION

For the reasons stated above, Nationwide's motion for summary judgment (Doc. 60) is **GRANTED IN PART** as to DRHI-B's damages, to the extent that Nationwide is not obligated to pay any attorneys' fees and expenses incurred before May 2014, but is **DENIED** as to Nationwide's claim for declaratory judgment and as to DRHI-B's counterclaims for breach of contract and bad faith. Furthermore, Nationwide's motions to strike (Docs. 69 & 74) are both **DENIED**, and its motion to preclude evidence of counterclaim plaintiff's contract-related damages (Doc. 59) is **MOOT**.

**DONE** and **ORDERED** this 6th day of October, 2016.

/s/  Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE

---

[17] The Court has reduced the claimed attorneys' fees by $47,889.80 (the amount billed and paid from May 2013 through April 30, 2014) and the expenses by $2,678.55 (the amount billed and paid in that same timeframe). The fees and expenses incurred before DRHI-B was named as a defendant in the underlying suit totals $50,568.35.