### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **NATIONWIDE MUTUAL FIRE INSURANCE COMPANY,** ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) ) | **Civil Action No. 15-351-CG-N** |
| **D.R. HORTON, INC.— BIRMINGHAM,** ) ) ) ) | |
| **Defendant** ) | |

### ORDER

Plaintiff Nationwide Mutual Fire Insurance Company ("Nationwide") has filed two motions (Docs. 81, 82) in reaction to this Court's Order in Document 80, seeking post-hoc relief for the following: (1) to alter or amend the denial of its two motions to strike (Docs. 69, 74) as well as the Court's mooting its motion to preclude evidence of contract-related damages (Doc. 59) and (2) to alter or amend the denial of summary judgment as to Defendant D.R. Horton, Inc.—Birmingham's ("DRHI-B") counterclaim for bad faith. In considering these two motions, the Court reviews the motions (Docs. 81, 82), DRHI-B's responses (Docs. 84, 85), and Nationwide's replies thereto (Docs. 86, 87). For the reasons set forth herein, the Court deems it proper to **DENY** Nationwide's two motions (Docs. 81, 82).

## I. Background

The Court thoroughly documented the facts of this case in its Order denying summary judgment (Doc. 80) (hereinafter the "Order" or "Summary

Judgment Order") and will not repeat them here to avoid repetition and squandering of judicial resources. In that Order, the Court denied Nationwide's motions to strike (Docs. 69, 74) attorney J. Burris ("Buzzy") Riis's affidavit (the "Affidavit") on the basis that its submission, although untimely, did not harm Nationwide. (*See* Doc. 80, pp. 18–21). Namely, the Court found the evidentiary record to be replete with timely discovery requests, which include the submission of Riis's name as one of DRHI-B's attorneys in the underlying *Saddler* action as well as plentiful information regarding the damages DRHI-B is seeking. To effect, the Court contented itself that DRHI-B had fully disclosed who had the knowledge to answer any of Nationwide's queries regarding damages, the existence of third-party settlements and agreements covering certain expenditures, and how much DRHI-B had accumulated, to date, in damages. *Id.* at 20–21. After making these findings and determining Nationwide would suffer no harm, the Court ruled its motion to preclude evidence of DRHI-B's contract-related damages to be moot. *Id.* at 21. The Court, however, did grant summary judgment as to a portion of DRHI-B's claimed damages because these damages were claimed for fees and expenses that arose before the *Saddler* action was filed in Alabama State Court in May 2014. *Id.* at 36. As such, the Court reduced the damages by a total of $50,568.35. *Id.* at 37.

Further, the Court denied Nationwide's motion for summary judgment as to DRHI-B's counterclaim for bad faith on the basis that "a reasonable fact

finder could interpret Nationwide's refusal to acknowledge the certificates of insurance and the attached endorsements that contradicted its internal information as more than 'mere negligence or mistake' but as an attempt to avoid coverage." (Doc. 80, p. 35). In so finding, the Court relied on two citations to the record but did not include an exhaustive list of the evidence supporting its conclusion. *Id.*

## II. Nationwide's Claims and the Parties' Arguments

In its first motion to alter or amend (Doc. 81) the Summary Judgment Order, Nationwide asks this Court to strike Riis's Affidavit on the basis of an anonymously delivered spreadsheet (the "Spreadsheet") that purports to expose "global" falsehoods contained in both the Affidavit and in DRHI-B's evidence supporting its damages claim. (Doc. 81, pp. 1–2; *see also* Doc. 81-6). Nationwide received the Spreadsheet on September 30, 2016, a full six days before the Order issued on October 6, 2016.[1] (*See* Doc. 81, p. 4; Doc. 80, p. 37). According to Nationwide, the anonymous sender did not provide a return address, and the envelope containing this information has no discernable postage markings. (Doc. 81-3). This unclaimed Spreadsheet asserts DRHI-B,

---

[1] For unexplained reasons, Nationwide did nothing with this newly gained information until Wednesday, October 12 at 5:39 P.M. At that time, Nationwide's counsel sent an e-mail to DRHI-B's counsel stating she had "received evidence" showing the Affidavit to be false and "afford[ed]" DRHI-B and its counsel "until noon on Friday, October 14, 2016 to withdraw" the Affidavit (approximately 37 hours). (Doc. 81-1, p. 2). DRHI-B's counsel responded on Friday, October 14 denying that the Affidavit is false and offering Nationwide access to "unredacted copies of the fee statements" relating to the damages, subject to minimal conditions. (Doc. 81-2, p. 2). Shortly after receiving this letter, Nationwide filed its motion.

through its counsel, is seeking $15,275.20 in damages that are categorized as "improper time" spent in defending and generally working on the underlying *Saddler* action. (*See* Doc. 81-6, p. 10). Nationwide failed to provide the Court with any calculation of the numbers provided in this alleged Spreadsheet, but the Court has determined the Spreadsheet claims DRHI-B's counsel improperly billed 64.8 hours from June 2014 through July 2016. (*See generally* Doc. 81-6).

Using this uncredited source, Nationwide accuses Mr. Riis of submitting a patently false Affidavit to this Court. In his Affidavit, Mr. Riis stated he had personal knowledge of the law firm's billing system and its billing identification numbers and claimed "[t]his billing ID number reflects work performed and expenses related only to the preparation of a defense" of the *Saddler* action. (Doc. 69-1, p. 3). Mr. Riis further opined, "the time spent and billed on this case by all of the professionals in our firm was reasonable and necessary to properly defend the claims against [DRHI-B]" in the *Saddler* action. *Id.* at 5. After receiving the Spreadsheet, Nationwide contends Riis's Affidavit evidences DRHI-B's and its counsels' bad faith submissions to this Court as related to its damages claimed. Relying on Federal Rule of Civil Procedure 56(h), Nationwide asks this Court to sanction DRHI-B and its counsel by, "as a minimum," striking the Affidavit or even levying sanctions or issuing an order of civil contempt. (*See* Doc. 81, pp. 7–9). Further, because the Affidavit was submitted in bad faith, Nationwide argues

4

the Court must reconsider its motion to preclude DRHI-B's contract-related damages (Doc. 59). Upon reconsideration, Nationwide urges the Court to grant its motion and award summary judgment in its favor as to the damages in this case. *See id.* at 11–14.

In response, DRHI-B posits Nationwide's allegations of bad faith and submitting a false affidavit turn on a disputed meaning of the term "defense costs." (*See* Doc. 84, p. 3). DRHI-B contends "defense costs" include indemnification demands from third parties, pre-litigation efforts to obtain coverage from Nationwide, and other efforts to minimize its damages with third parties who will be providing coverage, such as Essex. *Id.* at 5. It argues courts throughout this country have construed "defense costs" broadly and that, as such, it did not include unnecessary or unrelated expenses and fees in its claim for damages and did not submit a false Affidavit. *See id.* at 8–9. In reply, Nationwide emphasizes the fact that DRHI-B has not attacked the Spreadsheet or characterizations of its billing statements in any way; further, it highlights certain entries on the Spreadsheet that bely DRHI-B's argument that the billing statements only contain work related to "defense costs" of the *Saddler* action. (Doc. 86, pp. 3–4). Further, Nationwide argues an insurer's duty to defend does not generally encompass an insured's claims for relief. *Id.* at 5. Moreover, Nationwide contends Essex, the third party insurer who is allegedly paying one-third of DRHI-B's damages, has not actually paid a full

third; this evidence, Nationwide continues, is further proof of DRHI-B's bad faith. *Id.* at 7.

In its second motion to alter or amend the Order (Doc. 82), Nationwide urges this Court to reconsider its rationale for denying summary judgment as to DRHI-B's counterclaim for bad faith. In particular, Nationwide focuses on the two references the Court provided to its log notes and urges the Court to see that these two points cannot support its conclusion. (*See* Doc. 82, pp. 1–2). This motion also informs the Court that, in reaching its conclusion, the Court must have considered improper evidence or relied on a mistaken interpretation of the governing law. In doing so, Nationwide reasserts (as it did in its submissions to the Court for its summary judgment motion) the Court must only consider the evidence available to it before it denied coverage to DRHI-B. *See id.* at 3–4. Nationwide maintains, as it did when originally arguing this point, that the information it had before this action commenced does not support a conclusion that it acted in bad faith. *Id.* at 4. DRHI-B responds by highlighting the fact that Nationwide puts forth a different interpretation than the Court (and DRHI-B's own arguments) only proves its counterclaim for bad faith presents a triable issue of fact. (*See* Doc. 85, pp. 1–2). DRHI-B bolsters its arguments to deny Nationwide's motion by pointing to other points in the record that cement the existence of facts creating a triable issue. (*See generally* Doc. 85).

Having addressed the parties' arguments in support of and opposition to the motions, the Court turns to the standards governing its consideration of the same.

## III. The Standard Governing a Rule 59(e) Motion to Alter or Amend

In its zeal to criticize this Court's Order, Nationwide utterly fails to consider the propriety of litigating (and, mostly, relitigating) such issues in federal district court pursuant to a motion to reconsider. Nationwide has not satisfied the Federal Rule of Civil Procedure 59(e) standard—which it fails to provide to the Court in its many submissions for these two motions—as the vast majority of its arguments either rehash what has already been said or otherwise fail to meet the "manifest error" threshold for relief. Nonetheless, the undersigned writes to the motions in the interest of identifying certain distortions of its Order to clarify the Order insofar as such clarification may be beneficial in subsequent proceedings.

The decision whether to alter or amend a judgment pursuant to Rule 59(e) is "'committed to the sound discretion of the district judge.'" *Mincey v. Head*, 206 F.3d 1106, 1137 (11th Cir. 2000) (quoting *Am. Home Assurance Co. v. Glenn Estess & Assocs.*, 763 F.2d 1237, 1238–39 (11th Cir. 1985)). "In the interests of finality and conservation of scare judicial resources, reconsideration of an order is an extraordinary remedy and is employed sparingly." *Gougler v. Sirius Prods, Inc.*, 370 F. Supp. 2d 1185, 1189 (S.D. Ala. 2005). The extremely limited nature of the Rule 59(e) remedy cannot be

overstated. To prevail on a motion to reconsider, "[t]he losing party must do more than show that a grant of the motion might have been warranted; [it] must demonstrate a justification for relief so compelling that the court was required to grant the motion." *Maradiaga v. United States*, 679 F.3d 1286, 1291 (11th Cir. 2012) (citations and internal marks omitted). The Supreme Court has confirmed motions to reconsider "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n. 5 (2008) (citation omitted). Motions to reconsider are not a vehicle for affording a litigant "two bites at the apple." *American Home Assur. Co.*, 763 F.2d at 1239. Nor are motions to reconsider properly filed as a kneejerk reaction by a dissatisfied federal court loser.[2] They are neither appeal substitutes nor a "dry run" to test arguments in anticipation of a forthcoming appeal. *See generally Cavaliere v. Allstate Ins. Co.*, 996 F.2d 1111, 1115 (11th Cir. 1993) ("the well-recognized rule . . . precludes the use of a Rule 60(b)

---

[2] *See, e.g.*, *Garrett v. Stanton*, 2010 WL 320492, *2 (S.D. Ala. Jan. 18, 2010) ("Far too often, litigants operate under the flawed assumption that any adverse ruling on a dispositive motion confers upon them license to move for reconsideration . . . as a matter of course, and to utilize that motion as a platform to criticize the judge's reasoning, to relitigate issues that have already been decided, to champion new arguments that could have been made before, and otherwise attempt a 'do-over' to erase a disappointing outcome. This is improper."); *Hughes v. Stryker Sales Corp.*, 2010 WL 2608957, *2 (S.D. Ala. June 28, 2010) (rejecting notion that motions to reconsider "are appropriate whenever the losing party thinks the District Court got it wrong"); *Dyas v. City of Fairhope*, 2009 WL 5062367, *3 (S.D. Ala. Dec. 23, 2009) (motions to reconsider "do not exist to permit losing parties to prop up arguments previously made or to inject new ones, nor to provide evidence or authority previously omitted").

motion as a substitute for a proper and timely appeal") (citation omitted); *In re Howell*, 242 B.R. 541, 542–42 (Bankr. N.D. Ga. 1999) ("Motions for reconsideration should not be used . . . as a substitute for appeal."). And of course, motions to reconsider (like all other pleadings filed in federal court) must not be filed for the purposes of delay or foot-dragging to prevent judicial proceedings from moving forward to a prompt, efficient resolution. *See generally* FED. R. CIV. PRO. 11(b)(1) (by filing a motion, filer certifies it is not being presented for an improper purpose).

Generally, courts have recognized three grounds which justify the reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice. *Summit Medical Center of Alabama, Inc. v. Riley,* 284 F. Supp. 2d 1350, 1355 (M.D. Ala. 2003). Here, plaintiff seeks reconsideration based on the need to correct clear error. A motion to reconsider based upon clear error is appropriate "when the Court has patently misunderstood a party . . . or has made a mistake, not of reasoning, but of apprehension." *Wendy's Int'l, Inc. v. Nu–Cape Constr., Inc.*, 169 F.R.D. 680, 684 (M.D. Fla. 1996). The opposite side of this coin is that "[a] motion to reconsider is not a vehicle for rehashing arguments the Court has already rejected or for attempting to refute the basis of the Court's earlier decision." *Lamar Advertising of Mobile, Inc. v. City of Lakeland, Fla.*, 189 F.R.D. 480 (M.D. Fla. Oct. 7, 1999). Nor does a motion for reconsideration provide an opportunity

9

to simply reargue—or argue for the first time—an issue the Court has once determined. *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007).  Court opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."  *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988).  Thus, "[t]he burden is upon the movant to establish the extraordinary circumstances supporting reconsideration." *Mannings v. Sch. Bd. of Hillsborough Cnty.*, 149 F.R.D. 235, 235 (M.D. Fla. 1993); *see also Maradiaga*, 679 F.3d at 1291 (the losing party "'must demonstrate a justification for relief so compelling that the district court was required to grant [the] motion'" (internal citation omitted). Notwithstanding Nationwide's failure to conform its Motions to the foregoing principles, they nonetheless govern the analysis herein.

## IV. Analysis of Nationwide's Motions to Alter or Amend

### A. Motion to Alter or Amend Order Denying Motions to Strike Affidavit and Motion to Preclude Evidence of Counterclaim Plaintiff's Contract-Related Damages

Federal Rule of Civil Procedure 56(h) penalizes the submission of an affidavit or other declaration if it is found to be submitted in bad faith:

> If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court—after notice and a reasonable time to respond—may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

FED. R. CIV. P. 56(h). Rule 56(h) stems from the 2010 amendments of the Rules and is a reclassification of Rule 56(g). Before the amendment, a sanction was mandatory upon a finding of bad faith, and the only identified sanctions were contempt and an award of expenses. FED. R. CIV. PRO. 56(h) advisory committee's note to 2010 amendment. Now, "[s]anctions are made discretionary, not mandatory, reflecting the experience that courts seldom invoke the independent Rule 56 authority to impose sanctions." *Id.* Moreover, the Court "has wide discretion in deciding what constitutes 'bad faith.'" 10B Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure* § 2742 (3d. ed. 1998). Many courts consider affidavits containing perjury, unabashed falsehood, or statements directly in conflict with prior testimony to be evidence of a bad faith submission. *See id.*; *see, e.g.*, *U.S. v. Nguyen*, 655 F. Supp. 2d 1203 (S.D. Ala. 2009); *Reyes v. Professional HEPA Certificate Corp.*, 74 F. Supp. 3d 489 (D. Puerto Rico 2015), *aff'd*, 817 F.3d 380 (1st Cir. 2016); *Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 Fed. App'x 873, 887 (11th Cir. 2015); *Rogers v. AC Humko Corp.*, 56 F. Supp. 2d 972 (W.D. Tenn. 1999). "It is axiomatic that sanctions under Rule 56(h) will not be imposed unless the court is convinced that the party employing the affidavits was acting in bad faith or solely for the purposes of delay." Wright et. al, *Federal Practice and Procedure* § 2742 (4th ed. 2016). If a court determines "the misinformation has been included negligently rather than intentionally," it will not apply sanctions. *Id.* (citing *Instituto Per Lo Sviluppo Economici*

*Dell' Italia Meridionale v. Sperti Prods., Inc.*, 323 F. Supp. 630 (S.D.N.Y. 1971)).

Having established the governing standard, the Court now turns to consider whether the evidence establishes DRHI-B and its counsel submitted Mr. Riis's Affidavit in bad faith.

### 1. The Falsity of the Affidavit

Nationwide contends Mr. Riis's Affidavit contains blatant falsehoods because it avers the "billing ID number reflects work performed and expenses related only to the preparation of a defense to the *Saddler* lawsuit." (Doc. 69-1, p. 3). It further states, "In my opinion, the time spent and billed on this case by all of the professionals in our firm was reasonable and necessary to properly defend the claims against [DRHI-B] in the underlying litigation." *Id.* at 5. To establish the apparent falsehood of the Affidavit, Nationwide relies substantially on the mysterious Spreadsheet it anonymously received.[3] This

---

[3] Nationwide also contends DRHI-B and its counsel admitted to knowing the Affidavit is false. (*See* Docs. 81, p. 2; 86, p. 4). Having reviewed the evidence submitted, the Court determines DRHI-B and its counsel did not make such an admission. DRHI-B, through counsel, stated, "Your contention that [Riis's] affidavit is 'false' and in violation of [Rule] 56(h) (e.g. filed in bad faith) is incorrect." (Doc. 81-2, p. 1). Moreover, DRHI-B's good faith gesture to notify Nationwide of its reevaluation of over two year's of billing statements and the removal of certain charges "relat[ing] directly to efforts to obtain indemnity from Nationwide" further evidences the Affidavit was not submitted to the Court in bad faith. Its letter to Nationwide maintains—as does its argument to this Court—that "fees related to efforts to obtain indemnification from other subcontractors and their carriers are compensable as related to the defense of the *Saddler* action because those efforts have reduced the fees for which Nationwide is responsible." *Id.*

Spreadsheet purportedly demonstrates that Defendant's counsel is improperly[4] claiming $15,275.20 for 64.8 hours worked, or roughly 4.16% of the damages claimed.[5] Naturally, DRHI-B disagrees with this assessment and claims that its billing statements, as well as the Affidavit, recognize the legal principal that defense costs are properly included in attorney's fees and expenses for an insurer's duty to defend. As such, the dispute about the falsity of the Affidavit turns upon the definition of "defense costs."

**a. The Meaning of "Defense Costs"**

Nationwide correctly contends that "various jurisdictions hold that an insurer's duty to defend generally does not extend to pursuing an insured's claims for relief." (Doc. 86, p. 5). What Nationwide does not consider, however, are the special circumstances in which courts have extended the duty to defend to include affirmative claims used as a defensive mechanism

---

Furthermore, Nationwide argues DRHI-B misrepresented its third-party agreement with Essex because Essex did not pay a full third of the damages. (Doc. 86, p. 7). Having reviewed the evidence Nationwide submitted, the Court finds Nationwide has stretched the truth too far when claiming the interrogatory answer is "at best inaccurate and at worst false." (*See id.*). The record clearly establishes Essex paid $120,710.05 of the claimed $374,662.39 billed. Nationwide did not provide the Court with a mathematical breakdown, presumably because it knew it would look incredibly foolish. The Court, of its own accord, calculates Essex paid 32.22% of the invoices billed. While not technically a full 33.33%, the Court cannot find DRHI-B or its counsel fundamentally misled the Court or Nationwide as to its arrangement with Essex or otherwise acted in bad faith.

[4] The Court notes the Spreadsheet fails to provide any methodology or other details of how it accounted for the "improper time." This in and of itself renders the Spreadsheet dubious in the Court's view.

[5] The damages, as set in the Order, total $366,794.44. (Doc. 80, p. 37). $15,275.20 equates to 4.16% of this total claim.

and strategy. As our sister court in the U. S. District Court for the District of

Colorado has thoroughly explained,

> A number of cases have held that the duty to defend
> includes paying for affirmative claims filed by the insured
> **in some circumstances**. For example, when the insured
> defendant files a counterclaim arising from the same facts
> as part of its defense strategy, several courts have held
> the insurer must pay the costs of the counterclaim as well
> as the costs of directly refuting the plaintiff's claim. *See
> Hartford Fire Ins. Co. v. Vita Craft Corp.*, 911 F. Supp. 2d
> 1164, 1183 (D. Kan. 2012) (holding that Hartford's duty to
> defend Vita Craft in the underlying case included the cost
> of Vita Craft's counterclaims that **were inextricably
> intertwined** and were part of the **defensive strategy** to
> reduce Vita Craft's liability); *Ultra Coachbuilders, Inc. v.
> Gen. Sec. Ins. Co.*, 229 F. Supp. 2d 284, 289 (S.D.N.Y.
> 2002) (holding that insurer must pay the costs of insured's
> counterclaims that were "'**inextricably intertwined
> with the defense** of [defendant's] claims and **necessary
> to the defense of the litigation as a strategic
> matter**'"); *Oscar W. Larson Co. v. United Capitol Ins. Co.*,
> 845 F. Supp. 458 (W.D. Mich. 1993), *aff'd*, 64 F.3d 1010
> (6th Cir. 1995) (where prosecuting counterclaims and
> cross claims is **defensive** and is **reasonably necessary
> to limit or defeat** the insured's liability, the costs are
> covered as **defense costs**); *cf. IBP, Inc. v. Nat'l Union
> Fire Ins. Co. of Pittsburgh, PA*, 299 F. Supp. 2d 1024, 1031
> (D.S.D. 2003) (defendant's cross claim against plaintiff in
> a separate law suit was "in essence IBP's answer to
> Tyson's complaint in Arkansas," and thus fell within the
> duty to defend).
>
> The facts of the present case admittedly distinguish it
> from those cases. Here we are dealing not with
> counterclaims against the plaintiff but with third-party
> claims against the subcontractors. [A witness] testified
> that insurers are often willing to pay those costs, and it is
> not difficult to imagine at least one situation where that
> would make perfect sense. Suppose, for example, Trimark
> had its own insurance. Because Trimark's insurer in that
> hypothetical may well be liable to indemnify as well as to
> defend Trimark, it might be eager to fund an effort to

> pass the indemnification burden through to the
> subcontractors by means of third-party contribution
> claims, at least where Trimarks' insurer is not also the
> insurer of a subcontractor.
>
> But that, too is not the case. Here, under Trimark's
> theory, Mountain States (and other insurers) would be
> paying the lawyers on both sides of the third-party claims.
> Trimark created the situation by insisting that the
> subcontractors provide the insurance rather than
> providing its own insurance. Neither the parties nor the
> Court found any case on point. The one case that tends to
> be the most supportive of Trimark's position is *Great West
> Casualty Co. v. Marathon Oil Co.*, 315 F. Supp. 2d 879
> (N.D. Ill. 2003).

*D.R. Horton, Inc.-Denver v. Mountain States Mut. Cas. Co.*, 69 F. Supp. 3d

1179, 1198–1200 (D. Colo. 2014) (emphasis supplied). The Colorado court

continues in its analysis of *Great West* and concludes,

> At the end of the day, it seems to me that the simple
> answer is that if Mountain States owes Trimark a
> defense, and if Trimark's pursuit of third-party claims
> against the subcontractors was a reasonable defense
> strategy (which Mountain States has never disputed),
> then those costs are part of the defense costs.

*Id.* at 1200. Just as our sister court adopted the reasoning of *Great West*, so

shall this Court, for reasons explained below.[6]

---

[6] In doing so, this Court recognizes the longstanding principal of law that an insurer which "breaches its duty to defend or unjustifiably refuses to defend its insured . . . forfeits control of the suit to the insured and may be held liable to its insured for costs incurred in providing its own defense." *Roger Kennedy Constr., Inc. v. Amerisure Ins. Co.*, 506 F. Supp. 2d 1185, 1196 (M.D. Fla. 2007); *see also* Restatement of the Law of Liability Insurance § 19 DD (2015). Given that Nationwide refused to defend DRHI-B in the underlying action, it cannot now claim dissatisfaction with how DRHI-B defended itself. As the issue of whether Nationwide breached its contract or

In *Great West*, 315 F. Supp. 2d 879 (N.D. Ill. 2003), Heidenreich Trucking Company picked up oil from Marathon Oil Company's terminals. In doing business, the companies agreed Heidenreich would defend and indemnify Marathon for any claims arising out of the presence of Heidenreich's drivers at the terminals, except for claims "arising solely out of [Marathon's] negligence." Heidenreich had a commercial general liability policy with Great West and named Marathon as an additional insured on that policy. This additional insured endorsement covered Marathon "only if [it is] liable for the conduct of [Heidenreich] and only to the extent of that liability." In a tragic accident, a Heidenreich employee, Mr. Howe, was killed at the Marathon terminal. Mr. Howe's estate sued Marathon, alleging its negligence caused his death. Marathon filed a third-party complaint for indemnification and contribution against Heidenreich.  After finding Great West had a duty to defend Marathon against the estate's claims, the court concluded, based upon thorough research, "the authority appears virtually uniform in holding that there is a class of affirmative claims which, if successful, have the effect of reducing or eliminating the insured's liability and that the costs and fees incurred in prosecuting such 'defensive' claims are encompassed in an insurer's duty to defend." *Id*. at 881.

The cases—some of which Nationwide relies upon in rebutting DRHI-B's arguments—in which courts have decided the counterclaims or cross-

---

otherwise had a duty to defend is still a triable issue (*see* Doc. 80), this Court will not discuss this further.

claims are not defense costs but rather are affirmative actions on the part of the insured are readily distinguishable from those in which the courts hold these costs constitute defensive costs. For example, Nationwide cites to *International Insurance Co. v. Rollprint Packaging Products, Inc.*, 728 N.E.2d 680 (Ill. App. Ct. 2000), to support the proposition that the duty to defend generally does not extend to cover the insured's affirmative claims for relief. Great West Casualty Company also cited to *Rollprint* to support its claim that it did not owe fees and expenses for any affirmative actions on the basis of its insured. As did the court in *Great West*, this Court easily distinguishes *Rollprint*: The counterclaim Rollprint sought to include was characterized as an "offensive" claim as it was a declaration as to its ownership of trade secrets. *See Rollprint*, 728 N.E.2d at 694. In *Great West*, the U. S. District Court for the Northern District of Illinois accurately and appropriately summarized the leading case law on this point, and this Court adopts its reasoning herein:

> The distinction recognized in *Rollprint* appears to represent the general rule. In *Safeguard Scientifics, Inc. v. Liberty Mutual Ins. Co.*, 766 F. Supp. 324, 334 (E.D. Pa. 1991), *aff'd in part rev'd in part*, 961 F.2d 209 (3d Cir. 1992) (without reported opinion), the court ruled broadly that the insurer's duty to defend extended to the litigation of non-compulsory counterclaims "inextricably intertwined with the defense" of the covered claims. In *Oscar W. Larson Co. v. United Capitol Insurance Co.*, 845 F. Supp. 458, 461 (W.D. Mich. 1993), cited in *Rollprint*, the court ruled that with respect to expenses relating to claims for affirmative relief, they are encompassed by the duty to defend if they are "expenses which are reasonable and necessary to limit or defeat liability." In *TIG*

*Insurance Co. v. Nobel Learning Communities, Inc.*, 2002 WL 1340332, at *1 (E.D. Pa. June 18, 2002), Nobel sued Dr. Levy, the previous owner of its assets, seeking a declaration of the parties' respective intellectual property rights. Levy and his associated entities counterclaimed for copyright infringement. In holding that Nobel's insurer had a duty to defend its affirmative claims, the court employed the same analysis, stating, "Although few courts have addressed the issue of an insurer's liability for affirmative claims by the insured, the courts that have found liability have done so where the claims could 'defeat or offset liability.' " *Id.* at *14, quoting *Safeguard Scientifics*, 766 F. Supp. at 333–34.

The issue was also discussed in *Perchinsky v. State*, 232 A.D. 2d 34, 660 N.Y.S.2d 177 (N.Y. App. Div. 1997). There, an employee of Lemon Enterprises, Inc. ("Lemon Enterprises") which had been hired by Todd's Kite World ("Kite World"), which in turn had been hired by Granny "G" Productions, Inc. ("Granny 'G' "), to decorate an armory for a Lions Club home show, fell and was injured in the course of installing wiring. The employee sued the Lions Club and Granny "G," who in turn commenced third-party actions against Kite World and Lemon Enterprises for contribution and/or indemnity. Granny "G" had an indemnification agreement with the Lions Club, pursuant to which the Lions Club sought indemnification for the costs and counsel fees it incurred in pursuing its third-party actions against Kite World and Lemon Enterprises. The court, while noting that the Lions Club could not recover for the expense of enforcing its contractual right to indemnification against Granny "G," ruled that the Lions Club was entitled not only to its costs of defense in the main claim, but its costs in pursuing the third-party actions against Kite World and Lemon Enterprises "because the filing of the third-party actions was an essential component of the defense of the main action . . . ." *Id.* at 181.

Great West has attempted to distinguish each of these authorities, or to argue that it is not binding authority, but it has come forward with not a single case that supports its argument that the duty to defend does not encompass fees and costs incurred in counterclaims or

18

> third-party actions aimed at shifting liability for the claim as to which the duty to defend exists. "Defense" is about avoiding liability. Claims and actions seeking third-party contribution and indemnification are a means of avoiding liability just as clearly as is contesting the claims alleged to give rise to liability. A duty to defend would be nothing but a form of words if it did not encompass all litigation by the insured which could defeat its liability, including claims and actions for contribution and indemnification.

*Great West*, 315 F. Supp. at 882–83.

Having considered the case law in other jurisdictions and the relevant principals of Alabama law, the Court finds the fees and expenses relating to DRHI-B's counsel's efforts to demand indemnification from third parties and other third party settlements are appropriately categorized as "defense costs" for the *Saddler* action and are thus properly included in its claim for damages. As such, the Court holds Mr. Riis's Affidavit is not patently false or otherwise submitted in bad faith. The Court, therefore, finds it proper to **DENY** Nationwide's motion to alter or amend (Doc. 81) and will neither issue sanctions to DRHI-B or its counsel nor strike the Affidavit. Further, the Court declines to reconsider Nationwide's motion to preclude evidence of contract-related damages, as the Affidavit and other evidence in the record amply evidence DRHI-B's damages. Notwithstanding this judgment, the Court hereby **COMPELS** DRHI-B to provide unredacted copies of the invoices and fee statements to Nationwide and to update its final calculation of damages it will seek at trial, keeping in mind the Court's reduction of

19

damages in the Order. The Court further **ORDERS** these statements, as provided, will be subject to the Protective Order (Doc. 48) entered in this case.

## B. Nationwide's Motion to Partially Alter or Amend Order Denying Motion for Summary Judgment

On a motion based upon Rule 59(e), Nationwide "'must demonstrate a justification for relief so compelling that the district court was required to grant [the] motion.'" *Maradiaga*, 679 F.3d at 1291 (internal citation omitted). In this case, however, Nationwide merely points to evidence that was in the record that it believes counters the Court's ruling and reasoning. (*See* Docs. 82, pp. 2–5; 87, pp. 3–6). Rule 59(e) motions are not intended "to give the moving party another 'bite at the apple' by permitting the arguing of issues and procedures that could and should have been raised prior to judgment." *Mincey*, 206 F.3d at 1137 n. 69; *see also Groover v. Michelin N. Am., Inc.*, 90 F. Supp. 2d 1236, 1256 (M.D. Ala. 2000) ("Additional facts and arguments that should have been made in the first instance are not appropriate grounds for a motion for reconsideration.").

Even if appropriately raised, Nationwide's arguments do not persuade the Court that a material issue of fact does not exist such that summary judgment could be granted in its favor. After a thorough reexamination of the record, including Ms. Thomas's log notes (Docs. 71-38, 71-39) and the information DRHI-B submitted to Nationwide September 2014 (Doc. 61-2), the Court stands by its original analysis. As early as June 26, 2014, Ms. Thomas advised Agent Kilgro, "there's no cov[erage] under the GL policy for

this [Worker's Compensation] loss so there would be no cov[erage] for ANYONE – ins[ure]d, [Additional Insured], etc[.] – if there's no cov[erage], there's no cov[erage]." (Doc. 71-39, p. 8). Numerous entries throughout Thomas's logbook indicate she had resolved DRHI-B did not have any endorsement for ongoing operations under the policy in effect, despite her claims that she would investigate this issue further. (*See id.* at pp. 2–5; Doc. 71-38, pp. 24–25, 29, 36–38).

Looking at the information she received from DRHI-B's counsel before the filing of the instant action, the Court once again concludes a reasonable jury could infer Nationwide acted in bad faith by conducting only surface level inquiries into why DRHI-B had received a certificate of insurance with the incorrect policy information printed on it.[7] The record clearly shows DRHI-B, through counsel, submitted a Certificate of Insurance for the August 2013 through August 2014 period with policy number ACP GLGO 2304496714. (Doc. 61-2, p. 3). Four of the attached endorsements contained this same policy number and indicated coverage for both ongoing and completed operations. *Id.* Upon receipt, Ms. Thomas merely informed DRHI-

---

[7] The Court recognizes it made a small but significant typographical error in its original Order by stating "certificates" instead of "certificate." (*See* Doc. 80, p. 35). The Court now corrects itself and finds that a reasonable fact finder could interpret Nationwide's refusal to acknowledge the certificate of insurance and the attached endorsements that contradicted its internal information as more than "mere negligence or mistake" but as an attempt to avoid coverage. To be perfectly clear, the Court only considered the documents DRHI-B, through counsel, submitted prior to the extensive discovery in this case at arriving at this conclusion in the instant Order and in its original Order.

B's counsel that, "it appears the policy number and dates on the certificates on insurance do not match up." (Doc. 61-3). She further informed counsel, "To make a long story short, the policy that was in force at the time of this accident, assuming the 5/16/13 date is correct, has only one additional insured endorsement on it, and it's for completed operations only. As this was not a completed operation, that additional insured endorsement would not be applicable to the loss." *Id.* In effect, the evidentiary record in full demonstrates facts that could lead a reasonable jury to determine that Nationwide did not fully investigate why the certificate of insurance DRHI-B sent to Thomas contained at least one notable error (that of the mismatched policy numbers). (*See also* Doc. 71-9, pp. 2, 54). Moreover, the Court has already noted sound Alabama law in this area, which requires errors in representing policy coverage to be construed against the insurer. *See Am. and Foreign Ins. Co., Inc. v. Tee Jays Mfg. Co., Inc.*, 699 So. 2d 1226, 1228 (Ala. 1997); *Waikar v. Royal Ins. Co. of Am., Inc.*, 765 So. 2d 11, 15 (Ala. Civ. App. 1999). As such, the Court stands firm behind its original reasoning and analysis, despite its one scrivener's error (*see* n. 7), and thus deems it proper to **DENY** Nationwide's motion to partially alter or amend (Doc. 82).

## V. Conclusion

Upon reviewing Nationwide's apocryphal evidence suggesting the falsity of Mr. Riis's Affidavit and the full and expanded evidentiary record relating to DRHI-B's claim for damages, the Court once again declines to

strike the Affidavit and will not revisit Nationwide's motion to preclude damages. The Court finds Nationwide's allegations of falsity and bad faith to be unfounded on the basis that law across this nation characterizes the fees and expenses it complains of as "defensive costs." Having reexamined the facts and evidence and engaged, anew, in substantially the same analysis as it did in its original Order, the Court determines it did not commit a clear error in denying summary judgment as to DRHI-B's counterclaim for bad faith. In so concluding, the Court determines Nationwide has failed to demonstrate "extraordinary circumstances" requiring further reconsideration of this Court's Order.

The Court, therefore, deems it proper to **DENY** Nationwide's motions to alter or amend the Order as issued in Document 80 (Docs. 81, 82). In light of the concluded settlement in the underlying *Saddler* action, the Court further **COMPELS** DRHI-B, through counsel, to produce unredacted copies of its fee statements to Nationwide within thirty (30) days of the issuance of this Order and **ORDERS** these documents to be placed under the Protective Order (Doc. 48) issued in this case.

**DONE** and **ORDERED** this 18th day of November, 2016.

/s/  Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE